[No. 17283.    Department One.    October 10, 1922.]

NATIONAL CITY BANK, *Appellant*, v. SEATTLE NATIONAL BANK, *Respondent*.[1]

BANKS AND BANKING—DRAFTS—BILLS OF LADING—DESCRIPTION OF GOODS—COMPLIANCE WITH LETTER OF CREDIT—LIABILITY. Where a letter of credit authorized a bank to make payment of drafts for "standard white granulated sugar" when accompanied by bills of lading issued therefor together with invoices covering quality and quantity, the bank is not authorized to make payment on invoices and documents specifying the shipment to consist of "granulated white sugar, Java No. 24, direct polarization 98.5 per cent"; since the bank must refuse the payment when the documents do not conform to the terms of the letter of credit.

Appeal from a judgment of the superior court for King county, Tallman, J., entered January 30, 1922, upon findings in favor of the defendant, dismissing an action upon a letter of credit, after a trial to the court. Affirmed.

*Guie & Halverstadt* and *Poe & Falknor*, for appellant.

*Bausman, Oldham, Bullitt & Eggerman*, for respondent.

TOLMAN, J.—By this action appellant, as plaintiff, sought a judgment against respondent, as defendant, upon a letter of credit issued by a Chicago bank, and from a judgment dismissing the action with prejudice, after a trial on the merits, the plaintiff has appealed.

There is little dispute regarding what we consider the main and governing facts involved, which are substantially as follows: On May 20, 1920, the Corn Exchange National Bank of Chicago telegraphed to respondent as follows:

[1]Reported in 209 Pac. 705.

"Please advise International Trading Company we are opening irrevocable credit in their favor seventy-two thousand eight hundred fifty dollars account John Sexton Company for one hundred fifty five tons standard white granulated sugar at twenty three dollars fifty cents net per hundred pounds FOB cars Seattle immediate shipment from Hongkong certificates by Hongkong Government and Lloyds covering quality net shipping weights inspection and analysis to accompany draft credit expiring August twentieth. Corn Exchange Natl. Bank."

The respondent, as requested, informed the International Trading Company of the receipt of the wire and of its contents. On the same day the Corn Exchange National Bank issued its letter of credit, mailing a copy thereof to respondent enclosed with a letter, the letter of credit and letter of transmission reading as follows:

"The Corn Exchange National Bank of Chicago.
                                    Commercial credit
                                    for domestic use.
         "Capital and Surplus $10,000,000.
$72,850.00 U. S.                              No. 1627.
                   "Chicago, May 20th, 1920.
"To International Trading Company
        of America, Inc.,
"Seattle, Washington.
    "Gentlemen: We hereby authorize you to draw on The Seattle National Bank, in Seattle, at sight for any sum or sums not exceeding in all Seventy Two Thousand Eight Hundred Fifty Dollars U. S. Gold for account of John Sexton & Company, Chicago, for invoice cost of One Hundred Fifty-five tons standard white granulated sugar at $23.50 net per 100 pounds packed in double sacks F.O.B. cars Seattle, Washington, to be shipped to John Sexton & Company, Chicago. Immediate shipment from Hongkong, China.
    "Railroad Bills of Lading issued to the order of the shipper and endorsed in blank, together with invoices, certificates by Hongkong Government and Lloyd's cov-

ering quality, net shipping weights, inspection and analysis must accompany drafts.

"The shipment must be completed and the drafts drawn by August 20th, 1920.

"We hereby agree with the drawers, endorsers and bona fide holders of drafts drawn under and in compliance with the terms of this credit that the same shall be duly honored upon presentation at the office of The Seattle National Bank, Seattle, Washington.

"Drafts under this Credit must bear upon their face the words: 'Drawn under Corn Exchange National Bank of Chicago Credit No. 1627, dated May 20th, 1920.'

"This credit is irrevocable up to and including August 20th, 1920.

"We are, gentlemen,
        "Yours faithfully,
            "Owen S. Reeves, Jr., V. P.
            "John S. Cook, Asst. Cash."
    "The Corn Exchange National Bank of Chicago
        "Capital and surplus $15,000,000.
                    "Chicago, May 20th, 1920.
"Seattle National Bank,
"Seattle, Washington.

"Dear Sirs:  We confirm our wire to you of today as follows:

" 'Please advise International Trading Company we are opening irrevocable credit in their favor seventy two thousand eight hundred fifty dollars account John Sexton Company for one hundred fifty five tons standard white granulated sugar at twenty three dollars fifty cents net per hundred pounds fob cars Seattle immediate shipment from Hongkong certificates by Hongkong government and Lloyd's covering quality net shipping weights inspection and analysis to accompany draft credit expiring August twentieth.'
and in connection with this Letter of Credit we hand you herewith copy of same No. 1627 which we have made available with your good selves.

"Would you kindly notify the beneficiaries that you have received a copy of this Credit and advise us if

you make any charge for negotiating drafts drawn under this Credit. Of course if you do not it is understood that we will credit your account here in Chicago on arrival of the drafts under date of the day in which you made payment in Seattle.

"Yours very truly,
"John S. Cook, Assistant Cashier."

On May 28, 1920, respondent replied thereto as follows:

"May 28, 1920.
"Corn Exchange National Bank,
"Chicago, Ills.

"Gentlemen: This will acknowledge receipt of your favor of May 20, confirming your wire of that date and enclosing copy of your Letter of Credit No. 1627 in favor of the International Trading Company of America.

"We will be pleased to negotiate drafts drawn under this Credit without charge, with the understanding that you will credit our account on the day that payment is made by us.

"Yours very truly,
"C. L. LaGrave,
"CLLaG-B                      Assistant Cashier."

The letter of credit called for delivery at Seattle, but its terms were subsequently modified so as to permit the delivery of 85 tons of sugar f.o.b. Seattle, and 70 tons f.o.b. San Francisco. No other change or modification of the terms of the letter of credit was ever made. It is not claimed that there was any communication, either oral or written, between the litigants here until about July 10, 1920, when, upon the arrival in San Francisco of the sugar to be delivered there, which was the first shipment to arrive, appellant received a telegram from its San Francisco correspondent advising it of the arrival of the sugar there, stating that certain documents with drafts drawn on the National City Bank were being presented and asked appellant to pay

them. This wire was taken by appellant's cashier to an officer of the respondent, who was then requested to wire the Corn Exchange National Bank for authority to make payment for the San Francisco shipment, under the letter of credit hereinbefore set out. This telegram was sent and a reply received refusing to authorize payment for the San Francisco shipment under the letter of credit here involved, for the reason that the documents did not conform to the terms of the letter of credit. This refusal being communicated to defendant, it in turn refused to make payment of the drafts drawn on it covering the San Francisco shipment, so that all parties refused to accept the documents or to pay any drafts drawn on account of the San Francisco shipment, on the ground of non-conformity of the documents with the terms of the respective letters of credit.

Thereafter the Seattle shipment of eighty-five tons of sugar arrived, preceded by the documents relating to the same. About July 21, appellant's cashier again saw an officer of the respondent, showed him the documents accompanying the Seattle shipment, and informed him that the same would be presented with draft for payment on the following day. After the refusal to accept the San Francisco shipment and the failure to secure authority from the Corn Exchange National Bank to pay drafts drawn against its letter of credit in payment for the same, respondent's officers advised appellant's officers that any drafts drawn against the Seattle shipment would not be paid by respondent without telegraphic advices from the Corn Exchange National Bank authorizing such payment. This authority being refused, respondent declined to pay the drafts, and after some attempt to in-

duce the Corn Exchange National Bank to recede from its position, this action was begun.

The letter of credit, which is the basis of this action, authorizes the payment of drafts for standard white granulated sugar when accompanied by railroad bills of lading issued to the order of the shipper and indorsed in blank, together with invoices, certificates of Hongkong government and Lloyds' covering quality, net shipping weights, inspection and analysis. The documents accompanying the drafts presented by appellant, payment of which was refused by respondent, did not contain the words "standard white granulated sugar," but did specify the shipment as consisting of "granulated white sugar, Java No. 24, direct polarization 98.5 per cent." The bills of lading which accompanied the drafts showed that a considerable per centage of the sacks containing the sugar was stained from the contents sweating. All of the communications between the two litigant banks were oral. The Corn Exchange National Bank had no account with the Seattle National Bank, but was in fact indebted to the Seattle National Bank at the time in question. The trial court in passing upon the issues involved stated his views as follows:

". . . and I will only take up the point of whether or not the documents which came from the Government of Hongkong and Lloyds contain the necessary words which were in the letter of credit. This letter of credit, among other things, says they will pay—that is not the word but that is what is meant—$72,850 U. S. Gold for account of John Sexton & Company, Chicago, for invoice cost of 155 tons of standard white granulated sugar. . . Under the evidence and the law, the crux of this matter is the $72,850, and that the sugar shall be standard white granulated sugar.

". . . but the crux of the matter and the gist of

16—121 Wash.

the matter is that it must be standard white granulated sugar. Had these documents from Hongkong contained those four words just as they are here, I doubt if this suit would ever have been commenced, because this document would have been paid by the Seattle National Bank promptly, in my judgment. . .

"Hence, I say that, under the evidence and under the law, the bank was justified in following the words of this letter of credit and when those words in this letter of credit, 'standard white granulated sugar' did not appear verbatim in the documents from Hongkong, in my judgment the defendant was justified in refusing to pay."

Extensive briefs are presented going fully into the nature and history of letters of credit, but we see no reason why they should be regarded as mysterious, or why the rules of law relating to ordinary transactions are not applicable. Take the instant case. It is apparent that John Sexton & Company of Chicago were desirous of purchasing sugar to be shipped from Hongkong, and could obtain it only by establishing a firm and irrevocable credit, which would be available to the importer in financing the purchase and shipment of the sugar. Sexton & Company therefore went to its Chicago bank and by a deposit of money, or the pledging of its credit, procured the Chicago bank to issue the letter of credit here involved, upon the terms dictated by Sexton & Company. The Chicago bank presumably knew little or nothing about sugar, or about its customer's needs and desires beyond what it was then told, and was concerned only with carrying out its customer's wishes, paying for only such sugar as the customer desired to purchase, and doing only what the customer wished to be done, to the end that when the transaction should be completed it would have paid for exactly what it was instructed to pay for, and the customer would be bound, without question, to reimburse

it for its advances, plus its charges for the service. Hence, in its letter of credit, the original of which was no doubt sent to the importer to be used in financing his operations, the terms and conditions were all clearly and explicitly stated.

We are not here concerned with the original contract between Sexton & Company and the importer, and need not inquire as to whether the terms of that contract were met, so as to fix the liability of the buyer. Bankers are not dealers in sugar in such a case as this, but are dealers in documents only, and whatever contract was made by the banks must be determined from the letter of credit itself. Here, as is the custom in such cases, the banker was presented with documents passed over his counter, and asked to pay a large sum of money in exchange for them. His duty was not to go out and determine by personal examination of the shipment, or by the employment of experts, whether the goods actually conformed to the contract between the buyer and seller, nor even to determine, either from his own knowledge or by expert advice, whether the documents called for goods which the buyer would be bound to accept. The banker knows only the letter of credit, which is his only authority to act, and the documents which are presented under it. If these documents conform to the terms of the letter of credit he is bound to pay. If not, he is equally bound not to pay. The letter of credit called for standard white granulated sugar, while the bills of lading carried the following: "Granulated white sugar (Java No. 24) (direct polarization) 98.5%," and it was not within the province of the banker to say that the latter description meant identically the same thing as the former. We think this case falls squarely within the rule adopted in *Lamborn v. Lake Shore Banking & Trust Co.,* 196

App. Div. 504, 188 N. Y. Supp. 162, and later confirmed in 231 N. Y. 616, 132 N. E. 911, where it is said:

"Bills of lading were attached to the draft, which described the sugar as 550 bags of 'Java white sugar.' No copy of the invoice was sent to the defendant, and the draft drawn upon the defendant calls for the full amount thereof, 'with exchange.' The authorities are uniform to the effect that this Letter of Credit constitutes the sole contract with the shipper, and that the bank issuing the letter of credit has no concern with any question which may arise between the vendor and vendee of the merchandise for the purchase price for which the letter of credit was issued. *Frey & Son, Inc. v. Sherburne Co.*, 193 App. Div. 849, 184 N. Y. Supp. 661; *American Steel Co. v. Irving National Bank* (C. C. A.), 266 Fed. 41; *Bank of Montreal v. Recknagel*, 109 N. Y. 482, 17 N. E. 217.

"Under the terms of the letter of credit this draft could only be drawn against a bill of lading for Java white *granulated* sugar. The bill of lading attached to this draft, therefore, did not comply with the terms of the letter of credit, inasmuch as the sugar described therein was simply 'Java white sugar.' Affidavits are presented on the part of the plaintiff which tend to show that Java white granulated sugar was not only known in the market as Java white sugar, but was the only white sugar shipped from Java. These affidavits are to an extent contradicted upon this point by the affidavits of the defendant. But with this fact the defendant is not concerned. It is clear that the defendant is not under obligation to investigate and ascertain whether the contract between the vendor and vendee has been fulfilled. The only contract which the defendant has made was to honor the vendor's drafts as against the bill of lading for 'Java white granulated sugar.' "

Appellant criticizes this case, saying that the attempt to distinguish the case of *Bank of Montreal v. Recknagel,* 109 N. Y. 482, 17 N. E. 217, upon which it relies, is unsound and fallacious. The language criticized is as follows:

"The plaintiffs rely upon a clause in the opinion in the *Bank of Montreal v. Recknagel* case, *supra,* where it is said:

" 'The agreement of the parties called for a particular statement in the bill of lading to accompany the drafts, and that statement, *or the existence of facts which would have* authorized it, is a condition precedent to defendants' responsibility to respond to plaintiff's demand.'

"But that was a case where the bank had honored the letter of credit and was seeking to recover from the consignee moneys paid thereupon. In such a case, if the bank has actually paid in accordance with its contract with the consignee under which the bill was issued, a recovery might be allowed, even though the bill of lading did not specifically conform to the terms of the letter of credit, which was the contract actually made with the consignor. In the case at bar the defendant stands upon its contract recited in the letter of credit, and it would cause serious embarrassment to banks issuing such letters, if such banks were required to pay upon bills of lading against which the letter of credit was issued, which did not conform to the bill of lading as required to be drawn accompanying the draft which the bank had promised to pay."

We think the cases are clearly distinguishable. In an action against a purchaser it is only necessary to prove that the goods tendered were the goods purchased, no matter how described; that is, that the purchaser was offered that which he had contracted to purchase; while in such a case as this it makes no difference whether the goods tendered were in fact identical with the goods purchased, the only question being did the documents conform to the terms of the letter of credit? Not so conforming here, respondent was in duty bound to refuse payment of the draft, and the judgment appealed from is therefore affirmed.

PARKER, C. J., MITCHELL, and BRIDGES, JJ., concur.